IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

PORTLAND DIVISION

ROBERT DELEHANT, personal representative
of the ESTATE OF GEORGE RUPPEL,
deceased,

                          Plaintiff,

                v.

UNITED STATES OF AMERICA,

                         Defendant.

3:10-cv-178-AC

FINDINGS OF FACT AND
CONCLUSIONS OF LAW

ACOSTA, Magistrate Judge

      Robert Delehant, the son of George Ruppel, deceased, and the personal representative of Ruppel's estate, brings this action pursuant to the Federal Tort Claims Act ("FTCA"), §§ 1346(b) and 2671-2680, to recover damages against the United States for wrongful death and personal injury. Ruppel underwent surgery and recovery at the Veterans Administration Medical Center in Portland, Oregon ("Portland VAMC"). During his stay at the Portland VAMC, the medical staff allegedly failed to follow certain standard of care procedures causing Ruppel to contract and sustain severe decubitus ulcers,[1] which wounds were still present when he was

---

[1] A decubitus ulcer is also referred to as a pressure ulcer or bed sore.

Page 1 - FINDINGS OF FACT AND CONCLUSIONS OF LAW

transferred by ambulance to the Oregon Veterans Home ("OVH") in The Dalles for extended care. Ruppel died several months later and his family contends the improper treatment of his decubitus ulcers by the Portland VAMC was a substantial factor in his death.

The applicable substantive law in this FTCA case is that of the State of Oregon, where the alleged injuries occurred. *See* 28 U.S.C. §§ 1346(b)(1) and 2672. In Oregon, wrongful death actions are authorized under OR. REV. STAT. § 30.020; additionally, OR. REV. STAT. § 30.075 authorizes a personal injury claim to be continued by the representative of the deceased. Finally, the standard of care for medical professionals in Oregon is set forth in OR. REV. STAT. § 677.095(1).

Delehant alleges two claims for relief under Oregon law: In Count One of the Amended Complaint, Delehant alleges that between May 2, 2008, and June 5, 2008, nursing staff at the Portland VAMC allowed Ruppel's decubitus ulcers to progress such that, at discharge, his wounds were to the bone and severely infected. (Am. Compl. ¶ 3.) Delehant further alleges those infected wounds were a material contributing factor to his death on November 30, 2008. (Am. Compl. ¶ 3.) Delehant seeks to recover under OR. REV. STAT. § 30.020 for damages suffered for his father's wrongful death caused by the Portland VAMC's medical malpractice.

In Count Two of his Amended Complaint, Delehant again alleges nurses at the Portland VAMC allowed his father's decubitus ulcers to progress and by the time of Ruppel's discharge the wounds were to the bone and severely infected. (Am. Compl. ¶ 7.) Delehant seeks to recover under OR. REV. STAT. § 30.075 for damages during his father's lifetime arising from the personal injury to his father cause by the Portland VAMC's medical negligence.

The government contends its care of Ruppel met the applicable standard of care at all times during his stay at Portland VAMC; its care did not cause an infection of Ruppel's pressure

Page 2 - FINDINGS OF FACT AND CONCLUSIONS OF LAW

ulcers; and Ruppel's death resulted from his many other serious health conditions. The government also alleges an affirmative defense of contributory negligence against Ruppel based upon Ruppel's decision to visit his home on Father's Day 2008, against the advice of his care providers at the OVH where he was convalescing following his surgery.

Pursuant to the FTCA, Delehant's claims were tried to the court, without a jury. The five-day trial commenced on January 9, 2012. Following the trial, the parties submitted to the court their respective proposed Findings of Fact and Conclusions of Law. Upon review of the pleadings, sworn testimony of witnesses, other evidence introduced at trial by the parties and final arguments, the court makes the following Findings of Fact and Conclusions of Law as required by Rule 52(a)(1) of the Federal Rules of Civil Procedure:

## FINDINGS OF FACT

I.      Background

1.      Robert Delehant is the personal representative of the estate of George Ruppel. Ruppel was born on September 8, 1938, and died on November 30, 2008. Ruppel left behind a widow, Doris Ruppel, and two stepchildren, including Delehant. Although the Ruppels were married after Delehant became an adult, Ruppel was a father to Delehant even during Delehant's childhood.

2.      Earlier in his life, Ruppel was an alcoholic and a smoker, which contributed to a number of his medical problems. (Trial Transcript ("Tr.") 163:2-17; 195:13-18.) In the years prior to the medical care at issue in this case, Ruppel was diagnosed with coronary artery disease (with a triple coronary artery bypass graft at age 56 in 1995), congestive heart failure (with a cardiac catherization in 2004), complex tachycardia (with a defibrillator implanted in 2006),

hypertension, congestive obstructive pulmonary disease, peripheral vascular disease (with a femoral artery stent), and chronic kidney disease. (Def.'s Ex. 101 at VA000747.)

3.       In March 2008, Ruppel was admitted to the Portland VAMC due to dizziness. (Def.'s Ex. 101 at VA000174, VA000746.) Ruppel reported he experienced a decline in function for six months prior to his hospital admission, including increased fatigue, dizziness, and weight loss of at least 20 pounds. (Def.'s Ex. 101 at VA000174, VA000746.) He also experienced shortness of breath ("dyspnea on exertion" or "DOE") since his defibrillator was installed in 2006. (Def.'s Ex. 101 at VA000174, VA000746.)

4.       During his March 2008 hospitalization, Ruppel underwent a computed tomography of his chest, which revealed a cancerous mass on his right lung. (Trial Tr. 651-53; Def.'s Ex. 101 at VA000646.) Dr. Mark Deffebach, a pulmonologist at the Portland VAMC, referred Ruppel to thoracic surgery for consultation for possible lung surgery to remove the cancer. (Trial Tr. 651-53; Def.'s Ex. 101 at VA000646.) On April 7, 2008, Ruppel met with Dr. Mithran Sukumar, a thoracic surgeon at the Portland VAMC. Dr. Sukumar obtained informed consent from Ruppel to perform a video-assisted thoracoscopic surgery to remove the lower lobe of Ruppel's right lung. (Trial Tr. 208-209; Def.'s Ex. 101 at VA000627-29.)

5.       Despite Ruppel's prior medical history, it was determined Ruppel should undergo lung surgery because the lung cancer would be fatal if left untreated, and surgery offered a much better survival rate, approximately 70 to 90 percent, over radiation treatment, which was approximately 30 percent. (Trial Tr. 211-12; 654-56.) In addition, Ruppel performed well on a stair climbing test that is known to be one of the most powerful predictors of a patient's ability to recover from lung surgery. (Trial Tr. 211-12; 654-56.)

6.      On May 2, 2008, Dr. Sukumar performed a right lower lobectomy on Ruppel. (Trial Tr. 213-14.) During the surgery, Ruppel was placed on a gel pad to relieve pressure on the skin. No complications arose during the surgery. Following surgery, Ruppel was admitted to the Intensive Care Unit ("ICU") at the Portland VAMC for post-operative care. Although Ruppel had co-morbidities that complicated his medical condition, his doctors expected he would recover from the lung surgery and return to his home and his life.

II.      Prevention of Ruppel's Decubitus Ulcers

7.      Without proper medical care, ICU patients like Ruppel are at risk of developing decubitus ulcers, a localized injury of the skin caused by unrelieved pressure on the body. Various medical equipment and personal assistance used to prevent decubitus ulcers are part of basic medical training for doctors and nurses and are standard medical procedure when caring for ICU patients.

8.      Medical experts agree that a significant majority of decubitus ulcers are preventable and a primary prevention method is frequent is turning of the patient. At the Portland VAMC, preventing pressure ulcers is the responsibility of an interdisciplinary team that includes nursing, the primary provider, dietitian, clinical pharmacist specialist, rehabilitation staff, and a wound care specialist. (Pl.'s Ex. 9 at 11 (Veterans Health Administration ("VHA") Handbook 1180.2 – Assessment and Prevention of Pressure Ulcers).) After the patient's risk of developing pressure ulcers has been identified, the interdisciplinary team is required to implement "appropriate individualized interventions and monitor[] for the effectiveness of the interventions." (Pl.'s Ex. 9 at 10; *see also* Pl.'s Ex. 9 at 20 (Appendix C - Intervention Using Braden Scale).)

9.    The Braden Scale[2] is used to predict a patient's risk for developing a pressure ulcer by assessing six domains: activity, dietary intake, friction, mobility, sensory perception, and skin moisture. (Trial Tr. 46:11-14; Pl.'s Ex. 9 at 9, 16.)  Although Ruppel's initial Braden score upon admission to the ICU on May 2, 2008, was assessed by the Portland VAMC at 20, Dr. Michael Langan, an expert witness who testified on behalf of Delehant, stated Ruppel's Braden score at admission was 13, putting him at moderate risk of developing decubitus ulcers and, thereby, necessitating implementation of a prevention plan. (Trial Tr. 46:15-46:24.)  In fact, even the government's expert testified Ruppel was a "risky patient" from the onset due to his co-morbidities. (Trial Tr. 816:5-8.)  On May 4, 2008, Ruppel's Braden score was assessed at 17, which classified him as an at risk patient under the VHA protocols and, thus, mandated the interventions set forth in the VHA Handbook 1180.2, including, turning every two hours alternating positions, right, back, left; managing moisture by correcting the cause and reducing or eliminating the episodes; and managing nutrition by increasing protein intake more than 100% of the recommended daily allowance. (Def.'s Ex. 102 at VA001070; Pl.'s Ex. 9 at 20.)  By May 6, 2008, Ruppel's score was 14 on the Braden Scale, putting him in the moderate risk category. (Def.'s Ex. 102 at VA00119.)

10.    In accordance with the interventions set forth in the VHA Handbook 1180.2, the testimony at trial was that nurses working in the Portland VAMC ICU have a practice of turning immobile patients every two hours ("Q2"). (Trial Tr. 290:3-19, 408:2-6, 414:9-15:16, 435:25-436:13.)  In numerous instances, however, the nurses did not document the purported turns of

---

[2]On the Braden Scale, a score of 15-18 means the patient is "at risk" of developing pressure ulcers. A score of 13-15 is considered a "moderate risk," and a score of 12 or less puts the patient in the "high risk" category. (Pl.'s Ex. 9 at 20.)

Ruppel either on his ICU Flow Sheets or in his Progress Notes. For example, on May 2 and 3, 2008, immediately following surgery, the ICU Flow Sheet reports Ruppel as "self" turning. This is the only turn notation for twelve hours. (Def.'s Ex. 102 at VA001032, VA001038, VA001049.) The entry on May 3, 2008, at 0500 lists Ruppel as on "Q2" turns, but no turn is noted until eight hours later at 1300 hours. (Def.'s Ex. 102 at VA001049.)

11.    The government presented some testimony that Ruppel's decreasing oxygen saturation levels prevented the nurses from turning him regularly. The government also argued, however, that Ruppel was turned every two hours as required. The court notes there is only a single notation in the ICU Flow Sheets that a nurse was unable to turn Ruppel because of his decreasing oxygen saturation level. (Def.'s Ex. 102 at VA001071, VA001090.) If oxygen desaturation was preventing nurses from turning Ruppel, that condition should have been noted in the ICU Flow Sheets or in his medical records. Moreover, there is no record the nurses requested an order to increase Ruppel's oxygen prior to turning him; or to pre-medicate him with anti-anxiety drugs to reduce his anxiety upon turning. Finally, there is no evidence any of Ruppel's physicians ordered the nurses not to turn him every two hours.

12.    The court must determine whether it is more likely than not Ruppel was turned every two hours, as required by the Portland VAMC's own protocol. The medical records on the turning issue are incomplete and internally inconsistent. For example, the testimony at trial was the Portland VAMC allows nurses to list Q2 at the beginning of a shift and not document each turn. (Trial Tr. 297:7-18, 309:18-310:15.) The records, however, do not reflect this practice. Most often, a Q2 entry is made at the beginning of a shift, yet sporadic entries are made throughout the day, giving the impression that each time a position change occurred, it was recorded. Under the practices described at trial, it seems an initial Q2 entry would be made, and then there would be

other entries for that shift, or an initial Q2 documentation and then a notation every two hours, depending on the practice of that particular nurse. Additionally, Ruppel's family reported that on many occasions he was not turned Q2. (Trial Tr. 189:5-17.) Finally, once Ruppel's decubitus ulcers appeared, heightened scrutiny and vigilance was required, including the need for thorough and accurate records on his position changes. The court is unwilling to conclude that because it is the Portland VAMC practice to turn patients such as Ruppel every two hours, it must have happened here. At all times, the Portland VAMC was in control of the medical records and it is responsible for the accuracy of its own records. Based upon the evidence presented at trial and the record before the court, Delehant has established Ruppel likely was not turned every two hours during his stay at the Portland VAMC.

13.    The expert testimony in this case, the Portland VAMC medical staff, and the VHA Handbook 1180.2 all acknowledge the importance of managing nutrition in someone who is at risk of developing decubitus ulcers. (Trial Tr. 48:25-49:18; 408:2-21, Pl.'s Ex. 9 at 20.) Specifically, it is important for at-risk patients such as Ruppel to consume a high-protein diet. Ruppel was on a low-fat and low-cholesterol diet. (Trial Tr. 49:7-18.)

14.    Ruppel developed three decubitus ulcers while he was an inpatient at the Portland VAMC ICU. Delehant has established to a reasonable degree of medical certainty the Portland VAMC did not meet the community standard of care in its efforts to *prevent* Ruppel's decubitus ulcers. The testimony of Dr. Langan and William Bryson – a registered nurse certified in wounds, ostomy, and continence – was more persuasive than the government's experts on the issue of whether Ruppel's decubitus ulcers were preventable. An at-risk patient such as Ruppel can develop a pressure ulcer within two to six hours of the onset of pressure and, as such, the at-risk patient must be identified and have interventions implemented promptly in an attempt to

Page 8 - FINDINGS OF FACT AND CONCLUSIONS OF LAW

prevent the decubitus ulcers from forming. (Pl.'s Ex. 9 at 10.) The failures to turn Ruppel every two hours and to provide appropriate nutrition more likely than not contributed to Ruppel developing three pressure ulcers during his stay in the Portland VAMC ICU.

III.    Treatment of Ruppel's Decubitus Ulcers

15.    On May 7, 2008, Amy Schelle, a physical therapist, noted a large discolored area on Ruppel's buttocks and she further recorded he had skin integrity issues on his buttocks. (Def.'s Ex.101 at VA000212.) Dr. Molly Cone, a second-year surgery resident assigned to Ruppel's ICU care, ordered a wound care consult that same day. (Def.'s Ex. 101 at VA000572.) Once a decubitus ulcer appears on a patient, the VHA Handbook 1180.2 requires the wound care specialist or other member of the interdisciplinary team to determine "the location, stage, and size of any known or newly identified pressure ulcer." (Pl.'s Ex. 9 at 9.) In Ruppel's case, a wound care consult was ordered on May 7, 2008, but the specialist did not evaluate Ruppel until one week later on May 14, 2008.

16.    On May 9, 2008, Ruppel reported his pressure ulcers were more painful than his surgical site and he is prescribed oxycodone for the pain from the decubitus ulcer. Further, the record reflects that by this time, Ruppel developed three decubitus ulcers on this buttocks, with the right one draining and the appearance of all three wounds is listed as ecchymosis (hemorrhagic spot in the skin). (Def.'s Ex. 102 at VA001170.)

17.    The VHA Handbook 1180.2 requires, among other things, that changes in a patient's condition with respect to decubitus ulcers be reported to the practitioner and addressed. (Pl.'s Ex. 9 at 8.) Additionally, the protocol also dictates that pressure ulcers be assessed and documented routinely and a deterioration either in a patient's overall condition or in the pressure ulcer mandates a more immediate reassessment and reevaluation of the treatment plan. (Pl.'s Ex.

Page 9 - FINDINGS OF FACT AND CONCLUSIONS OF LAW

9 at 10.)  Nevertheless, Dr. Cone, who performed daily exams of Ruppel during his stay in the ICU and ordered the wound care consult, was not informed of these changes in Ruppel's condition.  In fact, Dr. Cone testified at trial: "It was never brought to my attention that they were worsening during any of the multiple times that I was in the patient's room each day by the nurse."  (Trial Tr. 269:2-15.)  Nor was the order for a wound care consult expedited.

18.    An entry by Rosanne Martin, an ICU nurse, on May 12, 2008, stated:   "Skin has continued to deteriorate since surgery.  Must keep off of back side as much as possible.  Skin consult pending."  (Def.'s Ex. 101 at VA000521.)  On the same day, and in spite of the presence of three decubitus ulcers on his buttocks, Ruppel was positioned first on his back for three hours and then sitting in a chair for nine hours, a total of twelve hours of pressure on the wounds. This positioning directly on the sores and lack of turning every two hours is contrary to the Portland VAMC's own practices and the VHA Handbook 1180.2.  The medical record also includes an entry from Tricia Jesperson, a first-year internal medicine resident assigned to Ruppel's ICU team, in which she states Ruppel's skin had "no sores/rashes."  (Def.'s 101 at VA000496.)

19.    On May 13, 2008, with the wound care consult still pending, Timothy Highlands, an ICU nurse, reports Ruppel "has stage 2 decubitus to bilateral buttocks . . . ."  (Def.'s Ex. 101 at VA000493.)

20.    On May 14, 2008, the Portland VAMC's wound care specialist, Laura LaRouche, examined Ruppel for the first time.  (Ex. 101 VA000476.)  LaRouche was filling in for the wound care nurse who was on maternity leave.  LaRouche's wound care training was completion of on-line classes for six weeks, and a three week in-person program.  LaRouche was not wound

care certified until July 2008, after Ruppel's tenure at the Portland VAMC, nor was she continence certified.

21.    LaRouche made the following assessments of Ruppel's three decubitus ulcers:

a. R buttock stage II with 40% dry, blackened, devitalized tissue 7cm x 4cm. Wound with scant amount of exudate[3] given it has been open to air and drying out. Patient reports mild to moderate pain at this time.

b. L buttock stage II 1 cm x .7 cm.

c. Gluteal fold very shallow. Unstageable given yellow slough[4] at base. 4 cm x 2.5 cm. 95% yellow base. Wound edge at proximal aspect still with slight denuding tissue present. Wound with scant amount of drainage but more than right buttock given it is in the fold.

22.    Pressure ulcers are classified according to four stages:

a. Stage 1: A non-blanchable reddening of the skin.

b. Stage II: A partial thickness skin loss involving epidermis, dermis, or both. The ulcer is superficial and presents clinically as an abrasion, blister or shallow crater.

c. Stage III: Full thickness skin loss involving damage to, or necrosis of, subcutaneous tissue that may extend down to, but not through, fascia. The ulcer presents clinically as a deep crater with or without undermining adjacent tissue.

d. Stage IV: Full thickness skin loss with extensive destruction, tissue necrosis or damage to muscle, bone, or supporting structures, *i.e.*, tendon, joint capsule. Undermining and sinus tracts also may be associated with Stage IV ulcers.

---

[3]Exudate is any fluid that has been forced out of the tissues or its capillaries because of inflammation or injury. It may contain serum, cellular debris, bacteria and leukocytes. (Pl.'s Ex. 9 at 5.)

[4]Slough is a necrotic and/or avascular tissue in the process of separating from the viable portions of the body and is usually light (yellow) colored, soft, moist, and stringy (at times). (Pl.'s Ex. 9 at 6.)

e.  Unstageable:  When eschar[5] is present, accurate staging of the pressure ulcer is not possible until the eschar has sloughed or the wound has been debrided.

(Pl.'s Ex. 9 at 17 (Appendix B - Assessment and Diagnosis); *see also* Def.'s Ex. 120 at 2-4.) Determination of a stage cannot be made until the deepest anatomic layer is visible, *i.e.*, healthy tissue is visible. (Pl.'s Ex. 9 at 13.)

23.    According to the VHA Handbook 1180.2 and Delehant's expert witnesses, LaRouche's staging of Ruppel's wounds on May 14, 2008, was inaccurate.  For example, a wound cannot be stage II with blackened, devitalized tissue.  Rather, if the right buttock wound had blackened tissue it was at least a stage III wound; and if the gluteal fold wound was unstageable it would be at a stage III or IV wound. (Pl.'s Ex. 9 at 17; Trial Tr. 54:4-57:4, 118:5-22.)

24.    On May 14, 2008, Internal Medicine Resident Jesperson noted a pressure wound, approximately 6" in diameter, on Ruppel's right buttock and ordered a wound consult, which was cancelled due to LaRouche's exam on that same day. (Def.'s Ex. 101 at VA000199.)  The medical records also include entries on May 15, 16, 18 and 20, 2008 from Internal Medicine Resident Jesperson that Ruppel had a sacral decubitus ulcer stage I with necrotic tissue. (Def.'s Ex. 101 at VA000467, VA000458, VA000440, VA000424.)  The presence of necrotic tissue is inconsistent with a stage I assessment of a decubitus ulcer. (Pl.'s Ex. 9 at 17; Trial Tr. 54:4-57:4, 118:5-22.)

25.    Beginning May 15, 2008, Internal Medicine Resident Jesperson reported to Dr. Deffebach, who was assigned to the ICU for a two-week block.  Dr. Deffebach never noted an

---

[5]Eschar is described as thick, leathery, frequently black or brown in color, necrotic (dead) or devitalized tissue that has lost its usual physical properties and biological activity.  Eschar may be loose or firmly adhered to the wound. (Pl.'s Ex. 9 at 5.)

"unstageable" decubitus ulcer, or even mentioned pressure ulcers in his Progress Notes for Ruppel, despite the wound care nurse examining Ruppel's wounds one day earlier. Nor did Dr. Deffebach ever note or refer to blackened, devitalized tissue or purulent drainage. (Trial Tr. 703:12-18; Def.'s Ex. 101.)

26.    On May 17, 2008, a small amount of purulent drainage from the right buttock wound was noted by Stanley Turlington, an ICU nurse. (Def.'s Ex. 101 at VA000452.) LaRouche testified she was not aware of the purulent drainage and if she had been aware of that condition she would have "done things differently" because of the risk of infection. (Trial Tr. 540:19-541:2, 560:3-5.) Additionally, Dr. Molly Osborne, Ruppel's attending physician at the Portland VAMC ICU testified at trial that she would have been concerned about purulent drainage from a decubitus ulcer. (Trial Tr. 577:15-17.) On May 18, 2008, Turlington reported the wound on Ruppel's right buttocks was not improving and a small amount of serosanguinous[6] drainage was noted. (Def.'s Ex. 101 at VA000444.)

27.    Ruppel's Progress Notes on May 20, 2008, include an entry authored by Bethany Huegel, an ICU nurse, that stated: "Decub on sacrum with sensicare. Difficult to assess wound as sensi care covers majority of it." (Def.'s Ex. 101 at VA000427.) There is a second entry by Rebecca Gillett, an ICU nurse, that stated: "Buttocks with barrier cream over excoriated skin appears to be not as red in surrounding skin  Wound with serous drainage[7] and granulation tissue forming in wound bed[.]" (Def.'s Ex. 101 at VA000429.)

_____

[6]Serosanguinous refers to containing or consisting of both blood and serous fluid. (Pl.'s Ex. 9 at 5.)

[7]Serous drainage or exudates is watery, clear, or slightly yellow, tan, or pink fluid that has separated from the blood and presents as drainage. (Pl.'s Ex. 9 at 5.)

28.    On May 22, 2008, Linda Smith, an ICU nurse, noted: "Decub on coccyx and right buttock are open, draining moderate amounts of serosanguinous secretions, surrounding tissue is red and puffy. [P]atient reports considerable discomfort.    Wound nurse consult remains pending." (Def.'s Ex. 101 at VA 000405.)

29.    On May 23, 2009, nine days after her initial consult, LaRouche again assessed Ruppel's wounds.  LaRouche's second assessment of Ruppel:

   a. gluteal fold wound had 100% yellow slough to wound base;

   b.  Ruppel had moderate pain with manipulation and the wound was not getting any better;

   c.    right buttock had a stage II viable wound base with scattered granulation tissue;

   d. left buttock had a small, partial thickness wound.

(Def.'s Ex. 101 at VA000398-99.)

30.    From May 22, 2008, at 0600, until May 25, 2008, at 1700, Ruppel's gluteal fold/coccyx wound was written in the Flow Sheets as a stage I.  (Def.'s Ex. 102 VA001412 - VA001474.) This was the same wound the wound care nurse said was unstageable on May 14, 2008, and, in fact, was never staged by the wound care nurse while Ruppel was at the Portland VAMC. ((Def.'s Ex. 101 VA000476-77; Trial Tr. 548:11-17.)

31.    Ruppel's Progress notes on May 26, 2008, include the following two entries regarding his decubitus wounds:

   a.  Lyanette Fernandez, an ICU nurse, reported:  "Skin ulcer to mid coccyx has soft whitish/yellowish eschar. . . .  Open areas to both cheeks of buttocks is clean appears to be granulating and covered with non-adhesive dressing to prevent further irritation from bed linens. Has small amount of serous drainage."

b.  Jennifer Spiker, an ICU nurse, reported, in part:  "Ulcers on buttocks healing. . . ."

(Def.'s Ex. 101 at VA000370, VA000376.)

32.    The following day, on May 27, 2008, Jy Hendricks-Jensen, an ICU nurse, reported:

"Dressing changes to coccyx and buttocks.  Wounds with granulation tissue.  Sm. Amount of

serous drainage from rt. gluteal area."  (Def.'s Ex. 101 at VA000367.)

33.    LaRouche's final exam of Ruppel occurred on May 30, 2008.  She noted Ruppel's gluteal

fold wound was improving following a seven-day course of panafil and the yellow slough had

begun to thin.  LaRouche was concerned Ruppel's fecal incontinence was contributing to the

wounds, but no incontinence measures were taken for the feces except barrier cream, despite

other available measures, and noting a need for an assessment to determine the cause of the

incontinence.  (Def.'s Ex. 101 at VA000185, VA000195; Trial Tr. 69:5-18, 116:16-25).  It was

LaRouche's view that a fecal pouch was not appropriate given the proximity of the wound to the

anus.  (Def.'s Ex. 101 at VA000196.)

34.    Although LaRouche was the Portland VAMC's wound care specialist at the time Ruppel

was in the ICU, there is no evidence before the court she ever staged Ruppel's coccyx wound;

nor did she measure or otherwise note the size of Ruppel's three decubitus ulcers  anytime after

May 14, 2008.  Finally, there are no notations in the medical record LaRouche ever attempted to

probe the wounds.  (Trial Tr. 548:11-17.)

35.    On June 1, 2008, just a few days before Ruppel was discharged to OVH, Debra Sullivan,

a nurse at Portland VAMC, assessed Ruppel's left buttocks decubitus ulcer as stage II, and

measuring approximately 5" long by 4" wide.  (Def.'s Ex. 101 at VA0003000.)  Additionally,

Progress Notes entered by Marianne Skerry, a Portland VAMC nurse, on June 4, 2008, one day

before he was discharged to OVH, assessed Ruppel's gluteal decubitus ulcer as having tenacious

Page 15 - FINDINGS OF FACT AND CONCLUSIONS OF LAW

slough; and she staged both his right and left buttocks ulcers at stage II. (Def.'s Ex. 101 at VA000263.)

36.    On May 15, 2008, Dr. Deffebach and Internal Medicine Resident Jesperson discussed Ruppel's elevated white blood count (leukocytosis) and opined it could be from his pneumonia, which was being treated with antibiotics, or from his sacral decubitus ulcer. (Def.'s Ex. 101 VA000469.)   Despite Ruppel's persistent elevated white blood count and the attending physician's opinion that his decubitus ulcers may be the source, there is no evidence any action was ever taken by the Portland VAMC to determine whether Ruppel's sores were infected.

37.    The level of bacteria that inhibits wound healing may not display the standard clinical signs of infection. Two subtle signs of infection in pressure ulcers are non-healing and abundant serous exudate. (Trial Tr. 822:25-825:7.)   While a tissue biopsy is considered the "gold standard" for obtaining a wound culture, a swab culture technique is a valid alternative. (Trial Tr. 57:19-59:16, 122:18-25.)

38.    A white blood cell count may be an indicator of infection. Between May 25 and June 5, 2008, Ruppel's white blood cell count was very elevated, over 20,000 with the normal range under 10,000, between May 25 and June 5, 2008. (Pl.'s Ex. 11.)   Moreover, determining a patient's sedimentation rate is also useful in determining whether there is an underlying infection. (Trial Tr. 106:14-107:1.)

39.    On June 5, 2008, Ruppel was discharged from the Portland VAMC and transferred by ambulance to the OVH, a state-owned nursing home in The Dalles, Oregon. On the day of discharge, Amy Burnette, a nurse at the Portland VAMC, viewed Ruppel's decubitus ulcers and reported he was a patient with "extensive wound care needs." (Def.'s Ex. 101 at VA000251.)

40.      The Portland VAMC did not meet the community standard of care in its *treatment* of Ruppel's decubitus ulcers while he was in the ICU.   On this issue, I find Dr. Langan's and wound care specialist Bryson's testimony and opinions to be more persuasive.   The evidence in the medical records and the testimony at trial shows many instances in which the medical staff did not adhere to the requirements set forth in the VHA Handbook 1180.2, and best practices for decubitus ulcers as testified to by the medical experts.   The Portland VAMC did not meet the community standard of care in the following ways:

a.  The failure to keep pressure off of the affected areas, including turning every two hours.   It is undisputed that turning a patient is paramount when treating pressure ulcers.   While the court has noted some of the instances above of the failures to turn Ruppel as required by the Portland VAMC's pressure ulcer intervention protocols, there are numerous other instances throughout Ruppel's stay in the ICU that his positions were not alternated appropriately.

b.  The failure for timely and regular assessments by the wound care specialist.   The evidence is undisputed there was a one-week lapse before the order for a wound care consult was filled.   Delehant's expert testified that a wound care assessment should have occurred within 48 hours, and even the government's expert testified that an expectation of a consult within 96 hours was written into the wound care policy.   (Trial Tr. 48:6-48:15, 723:22-724:3.)   Moreover, another nine days lapsed before Ruppel's decubitus ulcers were evaluated a second time, and a week again passed before he was seen for the third time.

c.  The failure to measure and appropriately stage Ruppel's decubitus ulcers.   The wound care specialist, and others, failed to appropriately stage and measure Ruppel's

Page 17 - FINDINGS OF FACT AND CONCLUSIONS OF LAW

decubitus ulcers as required by VA Handbook 1180.2. The medical records include many inconsistencies in the staging of his wounds, both inconsistent among the medical personnel involved in Ruppel's care and inconsistent when the condition of the wound as reported was compared to the VA Handbook 1180.2 stage definitions.

d. The failure to communicate changes in Ruppel's skin condition to physicians and other members of the interdisciplinary team including, but not limited to, purulent drainage, evolving condition of the wounds, inaccurate staging in the charts and absence of measurements. Many of these communication failures are chronicled above.

e. The failure to take some affirmative action to determine whether Ruppel's decubitus ulcers were infected in light of his elevated white blood cell count that could not be explained exclusively by the prednisone use, the persistent nature of his wounds, and the differential diagnosis of infection in his pressure ulcers by his attending physicians.

f. The failure to provide Ruppel appropriate nutrition in the form of a high protein, high calorie diet to aid in the prevention and treatment of decubitus ulcers.

41.    The court is convinced Ruppel endured significant pain and suffering as a result of his decubitus ulcers. In fact, almost from the outset, Ruppel required oxycodone to help manage his pain. The medical record includes numerous entries in which Ruppel reported pain and discomfort from the pressure ulcers. Additionally, Ruppel would describe his decubitus ulcers as causing him more pain than his incision at the surgery site.

42.    Upon Ruppel's arrival at OVH, Jeffrey Phipps, an OVH wound care nurse, discovered the pressure ulcers were more extensive than he had expected based on records and a photograph he previously received. Ruppel's wounds were among the worst Phipps had ever seen and he

classified the coccyx wound as "stage IV, measuring 9.0 cm x 4.0 cm, and covered in white and yellow [sic]; the right buttock wound as stage II, measuring 9.0 cm x. 4.0 cm, and covered in pink granulation & yellow fibrosis; the left buttock wound as stage II, measuring 3.5 cm x 2.0 cm, with pink and yellow fibrosis." (Pl.'s Ex. 2 at 3.)

43.     While Phipps initially assessed the coccyx wound to be a stage IV wound, Billie Holcomb, the OVH director of nursing, reassessed the wound as stage III.  (Trial Tr. 743-44.) Holcomb determined that what Phipps believed to be a tendon was actually a capsule of tissue covering muscle.

IV.     Infection of Ruppel's Decubitus Ulcers

44.     Delehant argues the coccyx pressure ulcer was a stage IV pressure ulcer at the time Ruppel was admitted to the OVH because exposed muscle is a feature of a stage IV wound. Based upon the evidence, it is more likely the pressure ulcer on Ruppel's coccyx was a stage III pressure ulcer and the two buttock ulcers were stage II pressure ulcers at the time of Ruppel's admission to the OVH.  Phipps testified at trial that it was the presence of tissue covering the muscle, not the muscle itself, that caused Ms. Holcomb to classify the wound as a stage III wound. (Trial Tr. 743-44.)  Other reasons also support a finding that the coccyx pressure ulcer was a stage III pressure ulcer at the time of admission to the OVH.  First, Phipps had only two years of nursing experience as a licensed practical nurse in June 2008, and Holcomb was a registered nurse and former wound care nurse with over 30 years of experience.  (Trial Tr. 741-742.)  Second, the coccyx wound was one centimeter deep at its deepest point on June 5, 2008, and was 1.5 centimeters deep a week later, on June 12, yet still considered a stage III wound. (Trial Tr. 748-752.)  Leana Tennison, another registered nurse and a resident care manager at the OVH, also staged the wound as a stage III in weekly assessments. (Def.'s Ex. 105 at 41, 50.)

45.     The medical records from OVH indicate Ruppel's pressure ulcers improved during his first nine days at the OVH, but became progressively worse over the latter half of the month of June 2008. (Def.'s Ex. 105 at 3-15.)  On June 14, 2008, one of Ruppel's wounds was noted as green, with serosanguinous discharge and an odor.  (Def.'s Ex. 105 at 6.)

46.     On June 15th, Ruppel left the OVH for a home visit.  Phipps cautioned Ruppel his wounds were in a fragile state and advised he should stay off his buttocks, shift positions frequently on his sides, and return to OVH immediately if the dressings came off his wounds. (Trial Tr. 759:14-760:4.)  During his home visit, Ruppel spent most of his time sitting on his recliner chair and the bandages on the wound came off during the visit. (Trial Tr. 199:10-14; Def.'s Ex. 105 at 7.)  The government contends this evidence demonstrates Ruppel did not take proper precautions to protect his pressure ulcers during the home visit, and the trauma to the wound from the prolonged pressure and exposure on the home visit was likely a significant factor in the worsening of Ruppel's wounds.  As such, the government asks the court to find Ruppel was negligent in not taking proper care of his wounds during his home visit.

46.     The United States has failed to show with a reasonable degree of medical probability that Ruppel's visit home on Father's Day was the cause of infection in Ruppel's decubitus ulcers. The evidence presented by the government on this issue came from Dr. Jeffery Leggett, one of the government's medical experts.  Dr. Leggett testified simply that additional pressure to the wounds and exposure to the environment on Ruppel's trip home would *contribute* to an infection.  (Trial Tr. 853:15-854:14 (emphasis added).)  Additionally, Dr. Leggett acknowledged Ruppel was already showing signs of infection on June 14, 2008, one day before his visit home. (Trial Tr. 874:12-14.)

47.    On June 30 2008, Ruppel was rushed from OVH to the Mid-Columbia Medical Center

("MCMC") due to septic shock, presumed to be from an infection of his decubitus ulcers.

(Def.'s Ex. 106 at MCMC 00003.)  On July 3 2008, Ruppel's pressure ulcers were surgically

drained, debrided and irrigated at the MCMC.  (Def.'s Ex. 106 at MCMC 000017.)  This was a

bedside procedure that went quickly, and it was reported Ruppel tolerated the procedure well and

was sent to the recovery room in stable condition.  (Def.'s Ex. 106 at MCMC 000017; Trial Tr.

172:2-8, 180:10-15.)  The decubitus ulcers were cultured and grew out of "Proteus Enterobacter

and group B beta Strep."  (Def.'s Ex. 106 at MCMC 000042.)  Subsequently, a second culture

also revealed the presence of "2+ beta Strep group B."  (Def.'s Ex. 106 at MCMC 000042.)

Ruppel was treated with broad spectrum antibiotics and he improved significantly.  (Def.'s Ex.

106 at MCMC 000042.)

48.    Delehant contends Ruppel's pressure ulcers first became infected while Ruppel was an

inpatient at the Portland VAMC.  In support, Delehant relies on descriptions of the wounds in the

medical records referencing symptoms associated with a potential infection.  Additionally, Delehant

points to Ruppel's elevated white blood count, including the differential diagnosis that Ruppel's

decubitus ulcers could be the source of that elevated count, and the failure of Ruppel's wounds to

heal.  In response the government argues, taken as a whole, the descriptions and assessments of

the wounds do not indicate that the wounds were infected.  Delehant most certainly presented

evidence at trial to raise a suspicion of the presence of infection in Ruppel's wounds during his

stay at the Portland VAMC ICU.  Additionally, as set forth above, the Portland VAMC should

have taken some affirmative steps to determine whether Ruppel's decubitus ulcers were infected.

Nevertheless, based upon the record before the court, Delehant has failed to establish to a

reasonable degree of medical certainty that Ruppel's wounds were infected at the Portland VAMC.

49.     On this issue, the court finds the testimony of Dr. Jeffery Leggett to be more persuasive than Delehant's expert witnesses.  Dr. Leggett specializes in infectious diseases and he sees patients in the ICU on a daily basis, including post-surgical patients similarly situated to Ruppel. (Trial Tr. 834:1-835:2.)  Dr. Leggett was unequivocal in his conclusion that Ruppel's decubitus ulcers were not infected during his stay at the Portland VAMC.  (Trial Tr. 841:18-21; *see also* Trial Tr. 792:21-793:1 (government's wound care expert, Patricia Cornwell, R.N., stated, based upon a description of the wounds, the wounds were not infected during Ruppel's stay at the Portland VAMC).)  Dr. Leggett testified regarding the time progression for the onset of the infections, including a discussion of the specific types of bacteria involved, contracted by Ruppel in this case.  Dr. Leggett concluded Ruppel's improvement of the wounds, and the timing of Ruppel's infections as diagnosed by the medical personnel at  MCMC, indicated there was no latent infection of the wounds acquired at the Portland VAMC.   (Trial Tr.  849:1-56:5.) Additionally, all the experts agreed that purulent drainage can be a sign of healing, so a single mention of a "small amount of purulent drainage" is insufficient to conclude an infection was present. (Trial Tr. 95:5-18, 791:20-793:1.)   Next, an elevated white blood count may be associated with things other than infection; may have been the result of an infection in Ruppel's lungs; or may have been the result of prednisone.  (Trial Tr. 664:1-665:10, 677:22-678:18, 705:15-706:8, 858:16-859:12, 860:13-861:15, 871:16-872:10.)  Finally, it is notable on this issue that the wounds appeared to be improving during the first week of  Ruppel's stay at the OVH, with the medical records consistently stating there were no signs or symptoms of infection. Although Delehant testified Ruppel's wounds had a foul smell at the time of Ruppel's admission

Page 22 - FINDINGS OF FACT AND CONCLUSIONS OF LAW

to the OVH, the medical records indicate there was no foul odor present until June 14, 2008. (Def.'s Ex. 106 at 1-15.)

50.    The court also notes Ruppel was on piperacillin (Zosyn) during his time at the Portland VAMC, which is the very antibiotic Delehant contends Ruppel needed for the type of infection for which he was subsequently diagnosed, and is the same antibiotic Ruppel received at the MCMC for his infection. (Def.'s Ex. 101 at VA000040, VA000046; Def.'s Ex. 106 at 15-18; Trial Tr. 955:6-22; Def.'s Ex. 106 at 15-18.)    Finally, Dr. Leggett testified that it takes approximately one to two weeks for an abscess to form and, therefore, the abscess detected on July 3, 2008, would not have been present during Ruppel's hospitalization at the Portland VAMC.    (Trial Tr. 849:14-851:19, 873:11-876:12.)

51.    Following the surgical debridement of Ruppel's pressure ulcers at the MCMC, his medical condition improved.    A determination was made that Ruppel was a good candidate for inpatient rehabilitation and, accordingly, Ruppel was scheduled for transfer to a facility on July 14, 2008.  (Def.'s Ex. 107 at MCMC000048.)

V.    Ruppel's Death

52.    In the months that followed, however, Ruppel was again hospitalized at the MCMC, Oregon Health Sciences University, and the Portland VAMC due to respiratory infections and a clostridium difficile infection.    The medical records indicate that during this time period Ruppel's respiratory problems became his primary health issue, and the pressure ulcers had improved. (Def.'s Ex. 111.)  Nevertheless, Ruppel was still being treated for his decubitus ulcers in October 2008.  (Pl.'s Ex. 8.)

53.    Ruppel's health declined such that he was admitted to the Veterans Administration facility in Vancouver, Washington for palliative care.  Ruppel died on November 30, 2008.  His

death certificate and medical records indicate that the immediate cause of death was congestive heart failure with an underlying cause of severe pulmonary fibrosis. (Def.'s Ex. 111 at 22; Def.'s Ex. 112.)

54.    There is much disagreement regarding Ruppel's cause of death. Delehant's expert, Dr. Langan, testified Ruppel was in a precarious position at the time the pressure ulcers became infected due to his multiple co-morbidities and little reserves, and the infection "tipped him over into the downward spiral that eventually caused his death." (Trial Tr. 73:9-73.) Conversely, the government's expert, Dr. Leggett, testified Ruppel's pressure ulcers were not a significant factor in causing his death. (Trial Tr. 865:21-23.) The court finds Dr. Leggett's testimony more persuasive on the issue of whether Ruppel's decubitus ulcers were a substantial factor in his death.

55.    Dr. Langan's testimony on this important issue is conclusory and he does not offer a progression to death caused by the wounds and supported by medical evidence. The fact the wounds were not treated properly and ultimately became infected, alone, does not explain Ruppel's death. The medical evidence in the record tends to show Ruppel's wounds were healing when he died. Prior to his death Ruppel's decubitus ulcers were described as "much improved"; the wound on his right buttock was smaller and there was smaller undermining in the "dimple" of the left buttock scar tissue. (Def.'s Ex. 111 at VA001639; *see also* Pl.'s Ex. 3 at 1 ("[s]acral decubitus, healing nicely").) The court has no doubt Ruppel's decubitus ulcers caused significant insult to his body. Dr. Langan, however, did not explain to the court how that insult translated to cause Ruppel's death, *i.e.,* an interrelationship between the wounds and the congestive heart failure or pulmonary fibrosis. Nor did Dr. Langan explain with a reasonable degree of medical certainty why Ruppel's death was not caused by congestive heart failure or his

Page 24 - FINDINGS OF FACT AND CONCLUSIONS OF LAW

severe pulmonary fibrosis.  There was significant testimony at trial and supporting medical evidence in the record of Ruppel's severely compromised pulmonary and cardiac functions. Without more, Dr. Langan's testimony that Ruppel's wounds "tipped him over," is insufficient to establish the decubitus ulcers were the substantial cause of Ruppel's death.

56.    Conversely, Dr. Leggett testified Ruppel died from congestive heart failure and pulmonary fibrosis which pre-dated his pressure ulcers.  Dr. Leggett further stated the pressure ulcers did not cause Ruppel's death. (Trial Tr. 862:13-867:7.)  Dr. Leggett relied upon the medical evidence to support his conclusion that Ruppel's decubitus ulcers were not a significant factor in causing his death, including references to specific medical test results that Ruppel's pressure wounds were healing.  (Trial Tr. 866:9-21; Def.'s Ex. 111 at VA001639.)  Moreover, the evidence as a whole supports Dr. Leggett's conclusion.  For example, the medical records indicate that Ruppel had experienced a decline in function for six months prior to his lung surgery, including increased fatigue, dizziness, and weight loss of at least 20 pounds. (Def.'s Ex. 101 at VA000174, VA000746.)  Additionally, Ruppel experienced DOE since his defibrillator was installed in 2006. (Def.'s Ex. 101 at VA000174, VA000746.)  Furthermore, although the lung surgery was required to cure Ruppel's cancer, testing prior to that procedure indicated Ruppel's heart and lungs were already impaired. This is demonstrated by the decreased ejection fraction of the heart (approximately 35%) and the decreased lung capacity (approximately 33% diffusing capacity of the lung for carbon monoxide) caused by the pre-existing pulmonary fibrosis.  (Trial Tr. 652:3-54:8; 864:2-865:9; Def.'s Ex. 101 at VA000535-536.)  Ruppel's poor response to the lung surgery, including his Adult Respiratory Distress Syndrome (which also predated the infection of the wounds), also tends to support the conclusion that Ruppel's decubitus ulcers were not a substantial factor in his death.  Delehant is unable to show to a

Page 25 - FINDINGS OF FACT AND CONCLUSIONS OF LAW

reasonable degree of medical certainty that Ruppel's decubitus ulcers were a substantial factor in causing his death.

57.     Delehant submitted an itemized list of special damages in the amount of $85,830.89 for medical care incurred at the MCMC ($85,103.89), and medical transport by Mid-Columbia Fire and Rescue ($727), incurred in an effort to treat Ruppel's decubitus ulcers during his lifetime. The court finds those requested damages to be reasonable and necessarily related to care and treatment of Ruppel's decubitus ulcers that developed during his stay at the Portland VAMC.

## CONCLUSIONS OF LAW

1.     Delehant's claims are brought under the Federal Tort Claims Act ("FTCA"), 28 U.S.C. §§ 1346(b) and 2671-2680.   "The Tort Claims Act was designed primarily to remove the sovereign immunity of the United States from suits in tort and, with certain specific exceptions, to render the Government liable in tort as a private individual would be under like circumstances." *Richards v. United States,* 369 U.S. 1, 6 (1962).

2.     Under the FTCA, liability and damages are determined in accordance with the law of the place where the acts or omissions occurred, in this case, the State of Oregon. *See* 28 U.S.C. § 1346(b); *Richards,* 369 U.S. at 10–11; *Cummings v. United States,* 704 F.2d 437, 440 (9th Cir. 1983).

3.     In his Amended Complaint, Delehant alleges two counts for relief.  Specifically, Count One is for wrongful death under the Oregon wrongful death statute, OR. REV. STAT. § 30.020. To prevail on his first claim, Delehant has the burden of proving[8] the Portland VAMC was

---

[8]Delehant's burden here is a preponderance of the evidence, *i.e.,* more likely than not. *See* OR. REV. STAT. § 10.095(5); *see also Riley Hill General Contractor, Inc. V. Tandy Corp.,* 303 Or. 390, 403, 737 P.2d 595 (1987) ("Proof by a 'preponderance of the evidence' means . . . the jury must believe . . . the facts asserted are more probably true than false.").

negligent in the care of Ruppel and that the negligence caused Ruppel's death. *See Joshi v. Providence Health System of Oregon Corp.,* 342 Or. 152, 149 P.3d 1164 (2006). To prevail on his second claim, Delehant must prove a violation in the standard of care owed to Ruppel and there is a reasonable probability the Portland VAMC's conduct caused Ruppel harm. In this instance, the government's negligence must be the cause-in-fact of the harm. *See, e.g., Son v. Ashland Community Healthcare Services,* 239 Or. App. 495, 505-06, 244 P.3d 835 (2010). A failure by Delehant to meet his burden on either the standard of care or the applicable causation factor must result in a judgment in favor of the United States.

4.      Oregon's wrongful death statute restricts recovery to the statutorily authorized beneficiaries. *See* OR. REV. STAT. §§ 30.020(2)(d) and (3). Delehant is not eligible for compensation for his loss of the society of Ruppel because he was an adult when he became Ruppel's stepson. *See* OR. REV. STAT. § 30.020(3)(a)

5.      Under Oregon law, "[A] physician or podiatric physician and surgeon licensed to practice medicine or podiatry by the Board of Medical Examiners for the State of Oregon has the duty to use that degree of care, skill and diligence that is used by ordinarily careful physicians or podiatric physicians and surgeons in the same or similar circumstances in the community of the physician or podiatric physician and surgeon or a similar community." OR. REV. STAT. § 677.095. Similarly, registered nurses are required to use that degree of skill and care and diligence which would have been used under the same or similar circumstances by reasonably careful and skillful nurses in the same or similar community. *See Bremner By and Through Bremner v. Charles,* 123 Or. App. 95, 105, 859 P.2d 1148 (1993). Under Oregon law, in most instances, liability for medical malpractice depends on expert testimony to prove a violation of the standard of care. *See Chouinard v. Health Ventures,* 179 Or. App. 507, 511-12, 39 P.3d 951

Page 27 - FINDINGS OF FACT AND CONCLUSIONS OF LAW

(2002); *see also Cleland v. Wilcox*, 273 Or. 883, 887, 543 P.2d 1032 (1975) ("[W]here injuries complained of are of such character as to require skilled and professional persons to determine the cause and extent thereof, the question is one of science and must necessarily be determined by testimony of skilled, professional persons." (quotations and citation omitted)). Accordingly, Delehant is required to present expert testimony to a reasonable medical probability that the Portland VAMC's conduct was the proximate cause of Ruppel's injuries. *See Horn v. Nat'l Hosp. Assoc.*, 169 Or. 654, 679 131 P.2d 455 (1942) (to prove causation plaintiff was required to show "competent action would have been substituted for negligent inaction, and that there was a reasonable probability that the subsequent ailments would have been less if the substitution had been made").

6.    For the reasons explained in the court's Findings of Fact section, above, Delehant established by a preponderance of the evidence the Portland VAMC fell below the community standard of care in its prevention and treatment of Ruppel's decubitus ulcers in the following ways:

    a.  The failure to keep pressure off of the affected areas, including turning every two hours.

    b.  The failure for timely and regular assessments by the wound care specialist.

    c.  The failure to measure and appropriately stage Ruppel's decubitus ulcers.

    d.  The failure to communicate changes in Ruppel's skin condition to physicians and other members of interdisciplinary team.

    e.  The failure to take some affirmative action to determine whether Ruppel's decubitus ulcers were infected in light of his elevated white blood cell count that could not be

explained exclusively by the prednisone use, the persistent nature of his wounds and the differential diagnosis of infection in his pressure ulcers by his attending physicians.

f.  The failure to provide Ruppel appropriate nutrition in the form of a high calorie and high protein diet to aid in prevention and treatment of decubitus ulcers.

Accordingly, Delehant has satisfied the first statutory requirement under Oregon's wrongful death statute. *See Joshi,* 342 Or. 152, 149 P.3d 1164.

7.    Under Oregon's wrongful death statute, Delehant must also demonstrate the Portland VAMC's "negligent act or omission more likely than not brought about the death of [Ruppel]" *Joshi,* 342 Or. at 159.   The element of causation, as used in OR. REV. STAT. § 30.020, "encompasses both the reasonable probability standard of causation as well as the substantial factor standard; the standard to be applied in a given case depends on the circumstances of that case." *Joshi,* 342 Or. at 164.  The court concludes that, under the circumstances here, Delehant is required to prove the Portland VAMC's acts or omissions were a substantial factor in bringing about Ruppel's death.  *See id.* at 161 (The substantial factor test is appropriate where "two causes concur to bring about an event, and either one of them, operating alone, would have been sufficient to cause the identical result.  In that situation, defendants' conduct is a cause of the event if it was a material element and a substantial factor in bringing it about." (quotations and citation omitted)).  However, if the evidence in a wrongful death action "discloses with equal cogency two or more possible causes for only one of which the defendant is responsible, the plaintiff has failed to discharge the burden of proof." *Copenhaver, Admtr'x v. Tripp,* 187 Or. 662, 682, 213 P.2d 450 (1950); *accord Joshi,* 342 Or. at 164.

8.    The decubitus ulcers were the only cause of death for which the government would be responsible.  Thus, under Oregon law, Delehant had the burden to establish the decubitus ulcers

Page 29 - FINDINGS OF FACT AND CONCLUSIONS OF LAW

alone were the substantial cause of Ruppel's death. *See Copenhaver*, 187 Or. at 682; *accord Joshi*, 342 Or. at 164. Delehant was unable to show to a reasonable degree of medical certainty the Portland VAMC's failure to meet the community standard of care with respect to Ruppel's decubitus ulcers was a substantial factor in Ruppel's death. Accordingly, JUDGMENT is entered in favor of the United States on Count One of Delehant's Amended Complaint.

9.     Count Two of Delehant's Amended Complaint is for personal injury under the Oregon survival statute, OR. REV. STAT. § 30.075. That statute provides that "[c]auses of action arising out of injuries to a person, caused by the wrongful act or omission of another, shall not abate upon the death of the injured person, and the personal representatives of the decedent may maintain an action against the wrongdoer, if the decedent might have maintained an action, had the decedent lived, against the wrongdoer for an injury done by the same act or omission." OR. REV. STAT. § 30.075(1).

10.    As stated above, Delehant established by a preponderance of the evidence the Portland VAMC fell below the community standard of care in its prevention and treatment of Ruppel's decubitus ulcers. Accordingly, Delehant has satisfied the first statutory requirement under Oregon's survival statute for person injury. Delehant is also required to show a reasonable probability that the Portland VAMC's conduct caused Ruppel harm. That requirement has been satisfied here as the negligent acts and omissions of the Portland VAMC were the proximate cause of Ruppel's severe wounds. Accordingly, JUDGMENT is entered in favor of Delehant on Count Two of the Amended Complaint.

11.    Any recovery by Delehant in this action must be diminished in proportion to the percentage of fault attributable to Ruppel based on the government's allegation of contributory negligence regarding Ruppel's June 15th home visit against medical advice. *See* OR. REV.

Page 30 - FINDINGS OF FACT AND CONCLUSIONS OF LAW

STAT. § 31.600.  Delehant is barred from any recovery if Ruppel's fault was greater than any fault of the government.  *Id.*  The United States failed to meet its burden on its affirmative defense of contributory negligence and Delehant is entitled to recover all damages caused by the United States' failure to meet the community standard of care in the prevention and treatment of Ruppel's decubitus ulcers during his stay at the Portland VAMC.

12.     The Oregon Legislature recognizes two types of civil actions for the circumstances faced by Delehant here:  (1) an action brought by the personal representative of the deceased for the loss suffered by the decedent prior to his death, *see* OR. REV. STAT. § 30.075 (a "survival action"); and (2) an action brought for the benefit of the deceased's dependants with regard to their own loss, *see* OR. REV. STAT. § 30.020 (a "wrongful death action").  Prior to 1995, OR. REV. STAT. § 30.020(3) provided that any recovery under the wrongful death statute must be reduced by any amount recovered under the survival statute, OR. REV. STAT. § 30.075.  Subsection (3) of OR. REV. STAT. § 30.020 was consistent with the proposition that a claim for damages for a decedent's pain and suffering could be maintained under either statute, but the Legislature intended to prevent a double recovery for damages incurred between the time of injury and death.  In 1995, the Oregon Legislature amended these two statutes by repealing subsection (3) of OR. REV. STAT. § 30.020, and simultaneously including a new provision, also numbered subsection (3), to OR. REV. STAT. § 30.075.  The new provision provides, in part:  "If an action for wrongful death under ORS 30.020 is brought, recovery of damages for disability, pain, suffering and loss of income during the period between injury to the decedent and the resulting death of the decedent may only be recovered in the wrongful death action. . . . "  OR. REV. STAT. § 30.075(3)*; see also Taylor v. Lane Cnty*, 213 Or. App. 633, 644-45, 162 P.3d 356 (Or. App. 2007) (same).  Although the language in subsection (3) of the present survival statue

Page 31 - FINDINGS OF FACT AND CONCLUSIONS OF LAW

does not expressly include the pre-1995 double recovery language, the court construes this provision as reducing recovery by the amount awarded to the decedent's personal representative under the wrongful death statute, and not as a strategy to require plaintiffs to make an election at the pleading stage, or a bar to recovery of certain damages under the survival statute.  The court's determination is based upon the court's review of the legislative history for the 1995 amendments to sections 30.020 and 30.075.  Specifically, subsection (3) to OR. REV. STAT. § 30.075 was added by Senate Bill 385, which was passed by the Oregon Legislature in 1995.  During hearings before the Senate Judiciary Subcommittee on Civil Process, Committee Counsel Max Williams made statements about the intent of the amendments.  On May 1, 1995, he stated the amendments were:

> [To] make clear that . . . subsection [ (2) (attorney fee shifting) ] does not apply to an action for damages arising out of injuries that result in death . . . .  This was to resolve the problem that exists where . . . actions under the survival statute were being brought in conjunction with wrongful death claims as a means of recovering attorney fees.  The language in this third paragraph here resolves that problem.  We also have some additional language added . . . which amends the wrongful death statute . . . .  omits a line dealing with a reduction . . . of the amount of recovery [under this section] if any decedent or decedent's personal representative under 30.075, which is the survival statute, because of an act or omission which caused the decedent's death.  So Legislative Counsel felt it was necessary to get both of those  . . . to match up on those two points.  *That's all that that amendment is attempting to accomplish.*

S. Judiciary Subcomm. on Civ. Process (Tape 44, side A, May 1, 1995) (comments of Max Williams (emphasis added)).  Additionally, the May 1, 1995, minutes paraphrase Williams' comments as reiterating "[t]he idea is that we are trying to break the practice of pleading a survival statute case with wrongful death cases in means of recovering attorney fees."  S. Judiciary Subcomm. on Civ. Process (May 1, 1995) (minutes).  The court is satisfied the legislative intent of subsection (3) of section 30.075 was to foreclose attempts to use the fee

Page 32 - FINDINGS OF FACT AND CONCLUSIONS OF LAW

shifting provisions of the survivor statute in the context of wrongful death recovery, not to limit plaintiff's damages under the survival statute. In fact, the amendment here was part of a more comprehensive legislative effort in Senate Bill 385 to reform attorneys fee awards. In sum, Delehant was permitted to allege and prove alternative claims to allow for the possibility that actionable negligence caused harm to Ruppel before death, but was not the ultimate cause of his death. Delehant alleged noneconomic damages for Ruppel's pain and suffering in the sum of $500,000, under both the survival and wrongful death statutes. Delehant brought both wrongful death and survivor causes of action here, yet he prevailed only under his survivor claim for personal injury. Clearly, if Delehant had been successful under the wrongful death action also, any award of damages for pain and suffering would have subsumed damages for Ruppel's claim that survived his death. In this instance, Delehant prevailed only on the personal injury action, thus, there is no possibility for double recovery on Ruppel's pain and suffering.

13.    The medical records and witness testimony establish Ruppel's decubitus ulcers were present and problematic for approximately three months between early May to late July, and there is no question Ruppel endured significant suffering during that time. Between August and in his death in late November, the evidence is not as clear regarding the nature and extent of Ruppel's pain and suffering as a result of the decubitus ulcers. Nevertheless, it is undisputed Ruppel's wounds were not fully resolved by the time of his death and, consequently, there is sufficient basis for the court to conclude the decubitus ulcers persisted in causing Ruppel residual suffering until the day of his death. Accordingly, noneconomic damages in the amount of $125,000 are awarded for Ruppel's pain and suffering caused by his decubitus ulcers.

14.    Economic damages are awarded in the amount of $85,830.89 for medical care incurred at the Mid-Columbia Medical Center ($85,103.89), and medical transport by Mid-Columbia Fire and Rescue ($727), in an effort to treat Ruppel's decubitus ulcers during his lifetime.

15.    Within 10 days, Delehant shall submit to the court an appropriate form of JUDGMENT in this matter.

IT IS SO ORDERED.

DATED this /day of October, 2012.

JOHN V. ACOSTA
United States Magistrate Judge